2019 IL App (1st) 180497-U

No. 1-18-0497

Order filed December 27, 2019

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 15886 |
| | ) | |
| QUOVADIUS TEMPLES, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The trial court's imposition of a 12-year extended-term sentence for robbery was not an abuse of discretion.

¶ 2  Following a bench trial, defendant Quovadius Temples was found guilty of theft, robbery, domestic battery, and violation of an order of protection ("VOOP"). He was sentenced to an extended term of 12 years' imprisonment for robbery (which merged into the theft conviction) and three years for both domestic battery and VOOP, with all terms to be served

concurrently. On appeal, defendant contends that the trial court abused its discretion in sentencing him to an extended term of 12 years for robbery. For the following reasons, we affirm.

¶ 3    Defendant was charged with multiple offenses in connection with an April 5, 2016 incident that involved his wife, Michelle Blizzard. Because defendant does not challenge the sufficiency of the evidence to sustain his convictions, we recount the facts here to the extent necessary to resolve the issue raised on appeal.

¶ 4    At trial, Michelle testified that she and defendant were married in April 2014. They had one child together, Quovadius Jr., who was born in January 2016. Michelle also had four other children. Michelle denied that she ever lived with defendant. She testified that she separated from defendant in July 2015 and had filed for divorce, but the divorce was not finalized as of the date of trial.

¶ 5    Michelle testified that she first obtained a court order of protection against defendant on November 30, 2015; defendant was not present in court on that date. On December 14, 2015, Michelle returned to court and obtained another order of protection; defendant was present in court on that date.[1] She acknowledged that, on March 21, 2016, the order of protection was modified to allow defendant to go to Michelle's residence, but that he was still prohibited from going to her place of employment.

¶ 6    As of April 5, 2016, Michelle lived with her children in a residence on South Central Park Avenue in Chicago. On that date, she was home with her children, including Quovadius Jr.,

---

[1] The State subsequently admitted into evidence a certified copy of the emergency order of protection obtained by Michelle against defendant on November 30, 2015, as well as a plenary order of protection entered on December 14, 2015.

who was approximately two-and-a-half months old, when she heard kicking at the front door. As she went to the door, defendant "kicked in the whole door and [it] tore off the wall." Defendant "grabbed" Quovadius Jr. "like [he] was a doll" and tossed the baby on a couch. Defendant then hit Michelle with his fist, striking her in the face near her left eye. Defendant reached for Michelle's purse, and they began "tussling" over the purse. Michelle released the purse when she saw defendant "ball[] up his fist" as if he was preparing to hit her again. Defendant took the purse and ran out the front door.

¶ 7    Michelle testified that the purse contained her children's birth certificates, her social security card, driver's license, state identification card, bank card, cash and house keys. She explained that the purse was eventually returned to her through a third person, but without her documents, cash and keys. Michelle recalled that as defendant left her home on April 5, 2016, she saw her sister, Pauline Blizzard (Pauline), pull up in a vehicle in front of the residence. Michelle told Pauline that defendant had taken her purse. Pauline told defendant to return it, but he refused to do so. Defendant then entered Michelle's van and drove away.

¶ 8    The State elicited additional testimony from Michelle regarding prior incidents involving defendant. Michelle described an incident on the evening of April 3, 2016, when she was working at a restaurant. Defendant entered the restaurant and stated that he was there to give Michelle her keys. Michelle told defendant to throw the keys over the counter, and defendant then asked her "how am I going to get home." Michelle responded that she did not care. At that point, defendant told Michelle: "b***h, I bust your s**t." He then "leaped over the counter" and hit her in the head with a small wooden bat before running out of the restaurant. Michelle saw "blood coming down [her] face" and she was taken to a hospital for treatment. At trial, Michelle

identified a photograph showing her blood at the scene of the incident, as well as photographs of her head wound. She further testified that, while she was in the hospital, defendant called her and said "b***h, it's not over with."

¶ 9      Michelle also described an incident on March 26, 2016, when she noticed that her bedroom window was damaged and that the keys to her van were missing. Later that same day, she saw defendant driving her van. She approached him and they struggled over the keys. She recalled that she had to jump on her van "when he was driving off, and he drove off while [she] was on the van." Michelle also described a prior incident on the evening of January 28, 2016, when she called police after defendant entered her residence without her permission.

¶ 10      Pauline testified that on April 5, 2016, she received a call from Michelle asking to "come pick her up because her and [defendant] had just had a fight." When Pauline arrived, she saw defendant exiting the home with Michelle's purse. Pauline saw that the front door "was kicked off the hinges" and that Michelle had a "black eye."

¶ 11      Tarnisha Rice testified that she knew both Michelle and defendant. On April 5, 2016, Michelle called Rice to tell her that defendant had "kicked her door in." Rice testified that a "couple of days afterwards" defendant gave her Michelle's purse, but it did not contain the birth certificates for Michelle's children, her social security card, or her bank card.

¶ 12      The State entered into evidence a certified copy of defendant's 2014 conviction for a violation of a prior order of protection in case number 14 DV 7834001; a certified copy of defendant's conviction for domestic battery in case number 07144200301; and a certified copy of the emergency and plenary orders of protection entered against defendant.

¶ 13    The defense called Serena Davis, who testified that she began dating defendant in March 2016, although she knew that defendant was married. Davis stated that, in March 2016, Michelle called her and angrily asked her if she was "messing around with" defendant. Davis related that defendant stayed overnight at her house from the end of March 2016 until April 6, 2016.

¶ 14    Defendant testified on his own behalf. He stated that he and Michelle had been married about three years and had one child together. Defendant testified that since February 2016, both he and Michelle lived in the same residence on South Central Park Avenue. He acknowledged that Michelle had obtained an order of protection against him. On March 21, 2016, he and Michelle went to court to modify the order of protection to allow him to go to their residence. Defendant stated that he began dating Davis "sometime around March" 2016.

¶ 15    Defendant testified that, about two weeks before the April 5, 2016 incident, Michelle learned that he was dating Davis. He stated that on April 5, 2016, he woke up at Davis' home. Michelle called him and said that their son had to be taken to the doctor, and defendant told her that he would take the child to the doctor. Defendant testified that he had keys to the residence, which he used to enter the front door. After he arrived, he received a phone call from a woman, and Michelle asked him who had called. Defendant answered affirmatively when asked if he and Michelle had "got[ten] into a fight," although he did not specifically describe his actions during that incident. Defendant acknowledged a 2010 conviction for failing to report a vehicle accident resulting in death, as well as a 2008 conviction for possession of methamphetamine.

¶ 16    On cross-examination, defendant acknowledged that although the order of protection was modified to allow him to enter Michelle's residence, the order prohibited him from physically abusing or harassing Michelle.

¶ 17    After closing arguments, the court found defendant guilty of theft, robbery, domestic battery, and VOOP.

¶ 18    Defendant filed a motion for new trial. During the hearing on the motion, defense counsel indicated that it sought to present testimony regarding the date of defendant's arrest, in order to contradict Rice's testimony as to when defendant returned Michelle's purse. The trial court agreed to "reopen the proofs." Counsel subsequently introduced a stipulation that a Chicago police officer would testify that defendant was taken into custody on the afternoon of April 6, 2016.

¶ 19    After the defense rested, the court stated that its "original ruling will stand" with respect to its findings of guilt on the charges of theft, robbery, domestic battery, and VOOP.

¶ 20    Defendant's presentence investigative (PSI) report reflected a criminal history including: a 2005 conviction for possession of a controlled substance; a 2007 conviction for domestic battery; a 2008 conviction for methamphetamine possession; a 2010 case in which he was convicted of failure to report an accident resulting in death and reckless homicide, and was sentenced to respective terms of eight and five years' imprisonment; a 2014 case in which he was found guilty of VOOP and resisting arrest; a 2015 case in which he was found guilty of criminal trespass to vehicles; and a 2016 conviction for possession of cannabis.

¶ 21    At defendant's sentencing hearing, the State emphasized that less than 48 hours before the April 5, 2016 incident, defendant struck Michelle with a bat at her workplace. The State noted that, in connection with that incident, defendant pled guilty to aggravated battery and had been sentenced to five years in prison. The State otherwise described defendant's criminal

history as reflected in the PSI report, including his convictions in 2010 for failing to report an accident resulting in death and reckless homicide.

¶ 22    In mitigation, defense counsel informed the court that defendant was employed and that the mother of his other children had recently passed away.

¶ 23    In sentencing defendant, the trial court commented as follows:

"THE COURT: So I'm going to sentence him on the robbery, count 5, theft, merges into robbery. He's X mandatory on the robbery; is that correct?

[PROSECUTOR]: Can I just have a moment to double-check the class of the –

THE COURT: you tell me that the – double-check. The way I heard it, it sounded like he was X mandatory.

[PROSECUTOR]: It is a Class 3, aggravated battery.

THE COURT: He's not X mandatory?

[PROSECUTOR]: No.

THE COURT: Okay. He's extendable?

[PROSECUTOR]: Yes.

THE COURT: Okay. Well, Mr. Temples, it's been something of a disaster here beating people up, using bats on women, reckless homicide where you also left the scene. Got a sentence of eight years from Judge Cannon in 2010. Involved with drugs. Facts of this case as well.

I'm going to find that he's representing a danger to the public and I'm going to impose extended term on this case. So for the robbery the sentence will

be 12 years in the penitentiary; domestic battery in violation of order of protection 3 years in the penitentiary each. Everything is concurrent."

¶ 24   The court additionally commented: "I will note the violence indicated in this case plus the proof-of-other-crimes evidence, plus the dead body that he left behind and carelessly left the scene after carelessly killing somebody, showing wantonness – there's some wantonness about him, that the public needs some protection for and I'm imposing an extended term upon him."

¶ 25   On January 25, 2018, the court sentenced defendant to a term of 12 years for robbery, concurrent with two 3-year terms for domestic battery and VOOP. Defendant filed a motion to reconsider sentence, which was denied.

¶ 26   On appeal, defendant contends that the trial court abused its discretion in sentencing him to an extended term of 12 years' imprisonment for robbery. He argues that the trial court's sentence of 12 years in prison, two years less than the maximum extended term allowed by statute, is not warranted in light of "the nature of the crime: physically speaking, a blow to the face and a purse snatching in which a small amount of cash and ultimately replaceable personal documents were taken."

¶ 27   In setting forth this argument, defendant acknowledges that, due to his 2010 Class 1 felony conviction for failure to report a car accident resulting in death, the trial court was statutorily "authorized to impose an extended term" for robbery, a Class 2 felony. See 730 ILCS 5/5-5-3.2(b)(1) (West 2018). He also recognizes that by statute, the court could choose to impose an extended term of up to 14 years in prison. See 730 ILCS 5/5-4.5-35(a) (West 2018). Nevertheless, he claims that the "facts of the case and [his] past would not justify a reasonable

sentencing court in imposing not only an extended-term sentence, but a sentence at the top of the extended range."

¶ 28    "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 120.  "[T]he trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." (Internal quotation marks omitted.) *Id.* (quoting *People v. Fern*, 189 Ill. 2d 48, 53 (1999)). "In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects. [Citation.]" *Id.* The reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Id.*

¶ 29    "[A] reviewing court may not modify a defendant's sentence absent an abuse of discretion. [Citation.]" *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 50. "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' [Citations.]" *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). If a sentence falls within the statutory range, we presume it is not excessive. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 27.

¶ 30    Here, defendant's 12-year extended-term sentence for robbery was within statutory limits and did not constitute an abuse of discretion. Robbery, as charged in this case, is a Class 2 felony. 720 ILCS 5/18-1(c) (West 2018). The sentencing range for a Class 2 offense is between 3 and 7 years. 730 ILCS 5/5-4.5-35(a) (West 2018). However, the sentence of imprisonment for an

extended-term Class 2 felony "shall be a term not less than 7 years and not more than 14 years."

*Id.*

¶ 31    Section 5-5-3.2(b) of the Unified Code of Corrections (Code) sets forth several factors that may be considered by the trial court as reasons to impose an extended-term sentence for a felony conviction. 730 ILCS 5/5-5-3.2(b) (West 2018). Two of those factors are relevant to defendant's arguments in this case. First, section 5-5-3.2(b)(1) of the Code allows the trial court to consider a defendant's prior felony conviction "of the same or similar class felony or greater class felony" that occurred within 10 years, in determining whether to sentence a defendant to an extended term. 730 ILCS 5/5-5-3.2(b)(1) (West 2018). Separately, section 5-5-3.2(b)(2) of the Code allows the court to consider an extended term "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty[.]" 730 ILCS 5/5-5-3.2(b)(2) (West 2018).

¶ 32    Significantly, defendant acknowledges that the trial court imposed an extended term pursuant to section 5-5-3.2(b)(1) of the Code, on the basis of his 2010 conviction for failure to report a vehicle accident resulting in death. Indeed, in his reply brief defendant acknowledges that "his prior greater-class felony conviction for failing to report a fatal car accident * * * was the trial court's explicit basis for considering an extended term." Defendant concedes that, in light of that prior conviction, the trial court was statutorily empowered to impose an extended sentence pursuant to section 5-5-3.2(b)(1) of the Code. He nevertheless argues "not that the trial court could not impose an extended term under statute, but that imposing a near-maximum extended term was an abuse of its discretion." We disagree.

¶ 33    As there is no dispute that the 12-year sentence was within the applicable statutory sentencing range of 7 to 14 years (730 ILCS 5/5-4.5-35(a) (West 2018)), we presume that it is not excessive. *Busse*, 2016 IL App (1st) 142941, ¶ 27. Thus, it is defendant's burden on appeal to show that the trial court abused its discretion; *i.e.*, that the 12-year sentence is greatly at variance with the spirit and purpose of the law or is "manifestly disproportionate" to the nature of the offense. *Id.* ¶ 20. Defendant is unable to meet his burden.

¶ 34    Defendant has not set forth any convincing reason that the 12-year sentence was an abuse of discretion. He does not dispute any aspect of his lengthy criminal history, nor does he suggest that the trial court failed to consider any mitigating factors. Rather, he takes issue with two comments made by the trial court during sentencing. First, he disputes the court's suggestion that he was a "danger to the public," arguing that "nothing in [his] campaign of misconduct demonstrated a danger to anyone but Michelle."

¶ 35    Defendant also challenges the trial court's remark that there was "some wantonness about [him]." He argues that his actions in the April 5, 2016 robbery do not constitute "exceptionally brutal or heinous behavior indicative of wanton cruelty" that could independently justify an extended-term sentence under section 5-5-3.2(b) of the Code. 730 ILCS 5/5-5-3.2(b)(2) (West 2018). Similarly, he argues that his 2010 conviction for reckless homicide was an "unintentional crime" that "cannot demonstrate wanton cruelty" that would support an extended-term sentence. Defendant thus requests that we vacate his 12-year robbery sentence and remand for a new sentencing hearing.

¶ 36    Defendant's arguments are unpersuasive. First, defendant cites no authority, and this court has found none, suggesting that imposition of the extended-term sentence under section 5-

5-3.2(b)(1) of the Code *required* a specific finding that he was a threat to the public. Contrary to defendant's argument, it is clear from the trial court transcript that, in calling defendant a "danger to the public," the court was not merely referring to his crimes against Michelle, but his entire criminal history, which included offenses not involving her, *i.e.* reckless homicide and failing to report an accident resulting in death. Moreover, as mentioned, we will not reweigh factors or substitute our judgment for that of the trial court, even if we may have weighed the factors differently. *Id*. We cannot say that the sentence imposed was unreasonable or manifestly disproportionate in light of the evidence presented at the trial and sentencing hearing. We thus conclude that: (1) the court was statutorily authorized to impose an extended term under section 5-5-3.2(b)(1) of the Code, and (2) the court did not abuse its discretion in imposing a 12-year sentence for robbery.

¶ 37    Given our conclusions, we need not delve into the merits of defendant's alternative argument regarding the court's reference to his "wantonness." Defendant suggests that the court's comment may have been intended as a finding that the robbery was committed with "exceptionally brutal or heinous behavior indicative of wanton cruelty," which could independently support imposition of an extended-term sentence pursuant to section 5-5-3.2(b)(2) of the Code. However, we have already determined that the extended-term sentence was otherwise permissible under section 5-5-3.2(b)(1) of the Code, which independently supports affirming the trial court. See *Beacham v. Walker*, 231 Ill. 2d 51, 61 (2008) (a reviewing court "may affirm the circuit court's judgment on any basis contained in the record"); *People v. Williams*, 193 Ill. 2d 306, 349 (2000) ("We may affirm the circuit court's decision for any appropriate reasons, regardless of whether the circuit court relied on those grounds[.]"). Thus, we

need not decide whether the trial court also intended to impose an extended-term sentence on the separate basis of "behavior indicative of wanton cruelty" pursuant to section 5-5-3.2(b)(2) of the Code, or whether the evidence supported a finding of "wanton cruelty" under that provision.

¶ 38     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 39     Affirmed.